May it please the Court, good morning. Teresa Statler for Valerium Atepa and family. The principal issue for the Court today in this asylum case concerns groups a government can't or won't control, and specifically whether, with regard to the police being the government, whether they must also somehow be tacitly supporting or otherwise complicit with acts of private persecution. The Board of Immigration Appeals, in a one-paragraph decision, affirmed the immigration judge's denial of asylum to the Metepa family. And the immigration judge principally relied on this Court's decision in Avotova-Eliseva, and he applied that to the facts in this case. The Board gave significant weight to the IJ's analysis of the law, and specifically Avotova-Eliseva, so I believe the Court can look to the oral decision of the immigration judge when making its decision. The immigration judge indicated that under Avotova-Eliseva, complicity or silent or not so silent proponents, the police need to be either complicit or proponents in some way in order for persecution to result from the acts of private actors. With all due respect to the Board of Immigration Appeals and the immigration judge, I do not believe in this circuit there is any requirement in the law that the police must be complicit or otherwise proponents at any level with the acts of harm, if they are on account of a protected ground in the asylum statute. Our case law does say that it must be conduct which the government is unable or unwilling to control. I guess the question then becomes, if the police are doing nothing, without regard to whether or not it's complicity, is that sufficient to establish inability or unwillingness? Yes, Your Honor, that's the nub of the issue. I believe that certainly if there is evidence of that, as there was in Avotova-Eliseva, the Russian police were complicit and involved at some level in the acts. That certainly is of help to an asylum claimant, but I respectfully believe that there is nothing in the case law that states that that is a requirement. Certainly, I think a police report, as in my case, the asylum applicant did make three police reports reporting the acts of harm and on one occasion was told specifically that the report would go no farther from this office and the reason being, among other things, I suppose, is that one of the perpetrators of the harm was the son of a police officer. So I would argue then that there is nothing specifically in the law that says that they must be. A police report, I think, would need to be made. What in the IJ's opinion says that there is a requirement in the law for that? I think he analyzed in some detail the Avotova decision, but I don't read his decision as saying a prerequisite for this finding is proof that the police are directly involved. Well, the way I read it, Your Honor, was he indicated that there would need to be complicity or the police would need to be silent or not so silent proponents. That was the exact. Again, I'm not sure that he said that's a requirement so much as he said, look, inaction by itself doesn't prove complicity. That's a somewhat softer and I think easier to justify statement based on Avotova. There's not a reason to infer from inaction that as a chronic or permanent condition, the authorities are unwilling or will be unable to control. The question isn't what happened necessarily in just one episode, but whether that will persist in the future. One episode of inaction may prove something, it might not. The IJ in this case decided it did not prove the more chronic condition. What do you have to offer up to show that in fact if your clients are forced to return, in the future they will suffer persecution because the authorities will be unwilling or unable to control? There is some evidence in the record, albeit not strong evidence, that the police are ineffective in the country. Ineffective is somewhat different. Ineffective is actually a term that can be applied to some parts of this country. That doesn't mean that the authorities are unwilling or unable to control as a legal proposition. It means that crime prevention and law enforcement is not perfect. So ineffective may not be quite enough and I think that I agree with you. The IJ is saying ineffective isn't enough and I don't know that that's incorrect under Avitova. That, I understand the question, Your Honor, but in this case there was somewhat more whether that can be called knowing toleration. They were specifically told, Mr. Matepa on one occasion, that nothing would be done. The report, nothing would go further. In the future, we don't know. Would that happen again? We don't know, but it did happen once. Ms. Teller, is it the problem here? I'm looking specifically at page 18 of the IJ's decision, its administrative record 67. As I read those two full paragraphs on that page, he's basically finding a failure of proof. The burden is on the asylum applicant to show persecution, and he's basically saying because of the fact that there is no affirmative evidence of either overt acts on the part of the police involved in the persecution or evidence of an outright refusal to do anything about it, that it essentially amounts to a failure of proof because of the ambiguity that we've been wrestling with here. In order to overturn that decision, we have to find that substantial evidence compels the opposite result. That's hard to do where the evidence is ambiguous or in equipoise, don't you think? I would agree with that, Your Honor. Let me ask a question, if I might. I'm interested or concerned about the applicants and what is characterized as a reasonable fear of prosecution. And it seems to me that is the starting point for at least a consideration of these matters. And as I view it, at least perhaps more generously than the Immigration Board, the various activities seem to me in a cumulative nature to have some impact on me at least. And one of the things I was interested in, and I didn't read the transcript of the proceedings, but with respect to the telephone calls that were reportedly made by the Matikpas to their house residents before they left and continued after that. And the memorandum that I read said that they were recorded. And were they recorded? And what was the nature of those comments that were being made repeatedly over a year period of time? My recollection, Your Honor, is the calls that were recorded were the ones that were received by the cousin who was living in their apartment. And he testified at the hearing. And I believe it may also be in his affidavit. But in his testimony, he indicated that the police, after doing the recordings, did nothing. There was no follow-up. Well, were the transcripts of the recordings, were they in the record of what was actually said? Pardon me? Were the recordings of what were made theoretically by the police, were they in the record about what the people were saying who called in? No, Your Honor, they were not recordings themselves. Why not? They were unable to be obtained. We had some difficulty getting the cousin to testify over the telephone from Moldova, but he was unable to get any sort of recording or any written police report evidence that he made the reports himself. And the Matikpas now have been in this country for about approximately what, five years or more? Almost six years, Your Honor. Six years, I believe it was in May of 2002 when they came in Kennedy Airport. Thank you. Ms. Dowling, did you want to save any time for rebuttal? Two minutes, if I might, Your Honor. Okay. You're down to 34 seconds. I'll give you a little more than that. Thank you. Let's hear from the government. May it please the Court. My name is James Cox, and I'm appearing on behalf of the United States. The issue presented in this case is whether substantial evidence supports the BIA's conclusion that the petitioner had failed his burden to show that the Moldovan government was unable or unwilling to halt the harassment that he and his family were experiencing from ethnic groups in Moldova. As the petitioner pointed out, the initial issue that the petitioner raises is a legal issue that is reviewed de novo, and that question is whether the BIA applied the correct legal standard on this issue. And the petitioner does argue that the BIA and the immigration judge held that there had to be some amount of government complicity. But if you look to the BIA decision, it quite clearly states the correct standard, and it's an either-or standard. And the BIA's decision says that the government had to either be actively involved in it or, uses the phrase or, unable or unwilling to control it. And so the BIA's opinion, albeit brief, does include the correct standard, and the IJ's, the transcript of the IJ's decision includes that same language. I think the difficulty here arises from the IJ's use of the Avitova case to distinguish this case. And in Avitova, this court held that not only was there evidence that the police were unable or unwilling to do anything, but there was also substantial evidence that the government was actually complicit in that. So in that case that the IJ distinguished, both prongs were present. So from that, I think that's where the argument comes from, that the IJ might have required both prongs. But his decision is clear that he is just distinguishing the Avitova case and was not treating that as a threshold case or something along those lines. The BIA seems to have moved right to the prong of the threat of future persecution. May I infer from the fact that they moved to that point that they essentially accepted for purposes of considering the asylum claim that past persecution had been shown, but even if it were shown, the Board found that there still was not a threat of future persecution? No, Your Honor. Okay. From the — and that argument has been briefed about whether the incidences rise to past persecution. And unfortunately, on the past persecution issue, the BIA only addresses the unable or unwilling to control issue. And then, as the Court said, moves forward to the unable or unwilling — I'm sorry, to the well-founded fear issue. One could actually infer from the BIA's statement on the well-founded fear issue that past individual risk that the Petitioners have put forward, when combined with the generalized risk that ethnic Ukrainians might face in Moldova, does not rise to a well-founded fear. But why would we get to a threat of future persecution if there is no evidence of past persecution and there's no cat claim? Your Honor, there — Petitioners have put forward the argument that even if this wasn't past persecution, that the generalized country of conditions — actually, the Avotova case is instructive on this, Your Honor. In Avotova, the Court actually found there was no past persecution. The incidences included pushing of the Petitioner by the military and the — and the police and a rape of a friend by the police. And the Court actually said, well, that doesn't arise to past persecution. The Court then went on and found a well-founded fear and also found that that was based on these incident — past incidences that didn't arise to the level of past persecution, based on the country conditions. Well, I have to confess, I was confused. I'm looking at the IJ's decision. This is the September 2, 2004 decision at page 16. And there's a — on the top of that page, kind of a convoluted sentence, which to me seems to say, you know, if they could get over this unwilling or unable to control factor, then it appears that what happened to them would qualify as past persecution. And I — I mean, I read that sentence several times and ultimately kind of shrugged and said it's hard to decipher, but it seems to speak in those terms because if he's saying, as frequently we see in these decisions, it's unfortunate what happened, but persecution is extreme, this wasn't extreme, usually we see very different language. You don't see anything like that here. So the IJ appears to be saying what happened to these people was bad enough to constitute persecution. The problem here is simply that unwilling or unable to control element. Is that your sense? Your Honor, I also read that phrase several times and found it to be extremely convoluted. And I — that is one inference that could be made from that statement. However, that statement is set apart from the actual holding on the — two pages later in the IJ's decision. Is there anything in the holding that suggests that he thinks what happened to these people wasn't severe enough? I mean, I understand the argument could be made and what happened to them is unfortunate, it's not the worst thing that's happened to people, and so they're — it's a debatable subject, but as I read the IJ's decision, he's not basing his — his adverse decision on that. He seems to be jumping over that. That's correct, Your Honor. There's — there's no affirmative indication in his opinion that he found these incidents is not to rise to the level of persecution. And we can't base our decision on a ground not found by the agency. Is that the case? That's correct, Your Honor. However, as Petitioner's Counsel pointed out, the BIA here did not adopt or incorporate the IJ's decision. So in this case, the BIA's decision is the — is the underlying decision that is reviewed, and the IJ's decision is a — is a guide to help us understand that. Did the BIA say that what happened to Petitioner's did not rise to the level of past persecution? Your Honor, I — yes, I believe that could be — well, Your Honor, the BIA did not say that. So — so if they didn't say it either, we — I mean, as I say, I think you can argue the issue, but if the agency didn't make such a determination, I don't think it's for us to make the determination. That's correct, Your Honor. I think we're very much on that single issue of unable — with regard to past, very much on that single issue of unable or unwilling to control. That's correct, Your Honor. And under the Andea case, this Court has found that it's appropriate to remand for an issue that's not been considered. And if this Court were to — to find in Petitioner's favor on the unable or unwilling to control issue, then that — that could be the appropriate remedy here. I was also just explaining how the BIA's analysis of the well-founded fear of persecution — one could infer that the court did not — or that the BIA did not find that the past incidences arise to the level of persecution, as — as the Court found in the Avotova case, actually. So — but there's certainly no — the BIA's decision certainly does not have an affirmative statement about the past acts. The issue is limited to the — to the unwilling or unable to control issue. On the application of that standard — Let me interrupt, I guess. You don't get there unless you've found a well-founded fear of prosecution — or persecution, right? You don't get to the second step. Your Honor, actually, in the Avotova case, the — the Court held that the past incidences were not — did not rise to the level of persecution. However, you could use those incidences to reach a well-founded fear of persecution if the generalized risk to the — to the population was severe enough. And so in Avotova, the Court found that there was a well-founded fear, even though there was not a past persecution. However, the unable or unwilling to control standard applies to both prongs. So it is true that the — that if the — if the standard of government being unable or unwilling to control is not met, then there cannot be a well-founded fear of — of persecution. So for that issue, it does apply to either prong. One other question, if I might. Did the government have the tapes of the recorded telephone calls to the residents? Your Honor, I am not aware of whether the tapes are in existence. It's reported that the tapes were made — Oh, the Moldovan — I'm sorry, Your Honor. The recorded calls to the house or residents. That the cousin received. Right. Yes, Your Honor. I am not aware of whether the Moldovan government still — You don't know what was said in those calls? I do not, other than from what the petitioner's cousin stated. And those calls occurred over a period of 18 months. They were never acted upon. However, there were calls over an 18-month period. Well, the calls extended a considerable period of time while the metikpas were still in that location, right? They extended over an extended period of time, Your Honor. However, in the Narvani case cited in the respondent's brief, this court differentiated between different levels of threats. In Narvani, the threats were only over the phone. And the court said, well, that's not as extreme a threat as when someone's brandishing a gun in your presence or something along those lines. One other thing, and then I'll be quiet. Arguably, if someone said on a telephone, if you don't leave this country, I'm going to kill you, that wouldn't be a well-founded, reasonable fear of prosecution? Your Honor, if there was a well-founded fear, there would have to also be a showing that the government was unable or unwilling to control, as occurred in Abitoba. But a threat can establish a well-founded fear. Your Honor, I see that my time is up. I wanted to just raise one more case. The Narvani case also involved an incident where the police took reports, but the effect of those reports the petitioner did not see. And that is a case cited by respondents to say that kind of the effectiveness of the response does not rise to the inability or unwillingness to control. Your Honor, that completes me, unless the Court has any questions. Anybody have any further questions? All right. Thank you very much, Counsel. Ms. Datler will give you the last word. Thank you, Your Honor. Just briefly, Abitoba-Elaceva was a pattern and practice case, and it is a little bit different from this case in that, as Counsel stated, there was no past persecution, and asylum was granted on the basis of a well-founded future fear. But I think the case most instructive for the Court to look at is the Mashiri case, which was issued after the immigration judge heard arguments in this case and had the hearing. And in that case, it involves the Afghani family who were in Germany. They made police reports. I think there was no implication at all that the German police were involved or complicit in any way, and yet this Court granted asylum or found that asylum should be granted to the claimants in that case. Thank you very much. Thank you, Counsel. The case just argued is submitted for decision, and we will now let's see. The next case on the calendar is Lemoyne v. Daniels, which is submitted on the brief. We'll now hear argument in Frank Farrell v. the Tri-County Metropolitan Transportation District of Oregon.
judges: Tallman, Clifton, Carroll